1                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS
2

3
                                    )
4    UNITED STATES OF AMERICA,       )
                                    )
5            Plaintiff,              )
                                    )    Criminal Action
6    v.                              )    No. 1:21-cr-10158-MLW-2
                                    )    Pages 1 to 32
7    Priscila Barbosa,               )
                                    )
8            Defendant.              )
                                    )
9

10

11            BEFORE THE HONORABLE MARK L. WOLF
                 UNITED STATES DISTRICT JUDGE
12

13                   SENTENCING HEARING

14

15                     June 23, 2023
                        2:30 p.m.
16

17         John J. Moakley United States Courthouse
                    Courtroom No. 2
18                 One Courthouse Way
               Boston, Massachusetts 02210
19

20

21

22              Jessica M. Leonard, CSR
                  Official Court Reporter
23         John J. Moakley United States Courthouse
                    One Courthouse Way
24             Boston, Massachusetts 02210
               JessicaMichaelLeonard@gmail.com
25

1    APPEARANCES:

2    On Behalf of the Government:

3        UNITED STATES ATTORNEY'S OFFICE
         By: David M. Holcomb
4        1 Courthouse Way
         Suite 9200
5        Boston, MA 02210
         (617) 756-9043
6        David.Holcomb@usdoj.gov

7

     On Behalf of the Defendant:
8
         Sullivan & Sullivan
9        By: William R. Sullivan, Jr
         25 Railroad Square
10       Suite 405
         Haverhill, MA 01832
11       978-521-6801
         Attywrs@aol.com
12

13

14

15

16

17

18

19

20

21

22

23

24
                    Proceedings reported and produced
25                    by computer-aided stenography.

1                    P R O C E E D I N G S

2

3              (The hearing was called to order at 2:30 p.m.)

4              THE CLERK:  Your Honor this is criminal matter

5    1:21-cr-10158, *United States v. Priscila Barbosa*.

6              THE COURT:  Good afternoon.  Would counsel please

7    identify themselves for the Court and for the record?

8              MR. HOLCOMB:  Good afternoon, Your Honor.  David

9    Holcomb and Kriss Basil for the United States.

10             MR. SULLIVAN:  Good afternoon, Your Honor.  Attorney

11   William Sullivan for the defendant, Priscila Barbosa.

12             THE COURT:  Ms. Barbosa is present.  We have a

13   Portuguese interpreter, but Mr. Sullivan, you stated that she

14   doesn't need the interpreter and prefers not to have

15   simultaneous interpretation; is that correct?

16             MR. SULLIVAN:  That is correct, Your Honor.

17             THE COURT:  But if there's anything Ms. Barbosa

18   doesn't understand or wants interpreted, if she tells me, I'll

19   have an interpreter for her.  Mr. Holcomb, have the victims

20   been notified and informed of their right to be heard today if

21   they wish?

22             MR. HOLCOMB:  They have, Your Honor, and none has

23   submitted any submissions other than Uber, the corporate

24   victim, whose letter I know you've received.

25             THE COURT:  Well, I have the Uber victim statement,

1    and is there any victim present who wishes to be heard orally

2    today?

3              MR. HOLCOMB:  Not today, Your Honor.  No.

4              THE COURT:  Well, in connection with this sentencing,

5    I have the Presentence Report with no objections by the

6    defendant.  I have, among other things, the Government's

7    sentencing memo, the defendant's corrected sentencing memo,

8    Number 1026, that has some letters appended to it.  Is there

9    anything else I should have received and read?  Well, I have

10   the Government's supplemental sort of omnibus -- the

11   Government's two sentencing memos.

12             MR. HOLCOMB:  I apologize, Your Honor.  It's Docket

13   991, the Supplemental Sentencing Memorandum.  Was that included

14   in your list?

15             THE COURT:  You've got to keep your voice up.  Say

16   that again.

17             MR. HOLCOMB:  There's Docket 991, the Government's

18   Supplemental Sentencing Memorandum with respect to Ms. Barbosa

19   that was in response to Your Honor's order.

20             THE COURT:  991?

21             MR. HOLCOMB:  That's correct.

22             THE COURT:  Let's see.  I have it.  The Government's

23   supplemental sentencing memo dated April 21, 2023.

24             MR. HOLCOMB:  Yes, Your Honor.

25             THE COURT:  Is there anything else I should have

1    received and read from you, Mr. Sullivan?

2              MR. SULLIVAN:  No, Your Honor.

3              THE COURT:  Are you retained or court-appointed

4    counsel?

5              MR. SULLIVAN:  Retained.

6              THE COURT:  As always, I'd like to try to assure we

7    have a clear and common sense of the legal framework of

8    sentencing.  It's stated succinctly by the Supreme Court in

9    *Gaul*.  I have to start by correctly calculating the guideline

10   range.  The guideline range is the starting point for

11   determining the sentence but may not be considered to be

12   reasonable.  Rather, I have to listen to the arguments of

13   counsel and anything the defendant may choose to say.  I have

14   to consider all of the Section 3553(a) sentencing factors and

15   decide what sentence is sufficient, and no more than necessary,

16   to serve the statutory purposes of sentencing.  If there's a

17   departure or variance, a substantial departure or variance

18   requires a more significant justification than a minor one, and

19   in any event, I have to explain the reasons for my sentence.

20   Do the parties agree that that's the framework for sentencing?

21             MR. HOLCOMB:  Yes, Your Honor.

22             MR. SULLIVAN:  Yes, Your Honor.

23             THE COURT:  And we're operating under the guideline

24   manual with the amendments -- well, the guideline manual now in

25   effect with the amendments, effective November 1, 2021.

1  Mr. Sullivan, have you and Ms. Barbosa each read the

2  Presentence Report?

3          MR. SULLIVAN:  Yes, Your Honor.

4          THE COURT:  Is there anything in it that you or she

5  thinks is inaccurate?

6          MR. SULLIVAN:  No, Your Honor.

7          THE COURT:  Ms. Barbosa, did you read the Presentence

8  Report?

9          THE DEFENDANT:  Yes, Your Honor.

10         THE COURT:  And is there anything in it that you think

11  is not correct?

12         THE DEFENDANT:  No, Your Honor.

13         THE COURT:  Okay.  You may be seated.  So, on February

14  24, I conducted a hearing on common sentencing issues and

15  expressed tentative views on the questions relevant to this

16  sentencing.  In the, I think, ten prior sentencings of

17  co-defendants in this case, I have found those tentative views

18  to be my final views.  But I'm interested in anything counsel

19  here may have to say before I make final rulings in this case.

20         But in summary, it's my present, still tentative, view

21  that the Total Offense Level is 20 and the Criminal History

22  Category is I.  Under Section 2B1.1, the Base Offense Level is

23  7.  I believe 12 levels should be added because the amount of

24  the loss is over $250,000 but not more than $550,000.  There's

25  a two-point enhancement because there were ten or more victims.

There's another two-point enhancement because sophisticated means were intentionally used. There's no enhancement for an authentication feature or for role in the offense, so the adjusted offense level is 23. The defendant will get three levels off for acceptance of responsibility, so the Total Offense Level, in my present view is 20, generating a guideline range of a total of 57 to 65 months. That is 33 to 41 months on the conspiracy conviction, plus another 24 months consecutive for the aggravated identity theft conviction.

I said earlier that, on February 24, I expressed some preliminary views. I subsequently, in I think ten other sentencings of co-defendants, found those views to be valid. In some respects, the defendant stipulated to enhancements that I don't think are applicable or proven in this case and, as I've done in other sentencings, rather than hold the defendant to her stipulation, which is not binding on me, I'm making the rulings that I find are legally correct and will avoid unjustified disparity with co-defendants who don't have comparable stipulations.

First -- and I'll give you a chance to address this after I explain. First, I find that Ms. Barbosa caused loss as it's defined in the guidelines, Section 2B1.1a and b, and that loss is comprised of amounts that she received directly in deposits from the rideshare and delivery companies, or the companies, in the amount of $284,429 in relevant conduct

1    relating to Mr. Da Fonseca only.  As I said, I find there's

2    loss for the reasons described in detail on February 24, 2023.

3    In essence, the rideshare and delivery companies were victims,

4    the defendant caused them pecuniary harm, and the services

5    provided by the drivers had, for the purpose of guideline

6    calculation, no value to be credited to reduce the amount of

7    the loss.

8           In essence, I find this case is analogous to

9    *Gonzalez-Alvarez*, 277 F.3d 73, 78 in which the First Circuit

10   found that adulterated milk in a regulated industry had no

11   value.  Here, the rideshare companies and delivery companies

12   were heavily regulated.  They require driver's licenses of

13   drivers.  They were obliged to conduct background checks --

14   including criminal history checks -- which would have revealed

15   if somebody was, for example, a sex offender.  And the drivers

16   in this case could not have passed those background checks.

17   They were not in the United States lawfully, did not have

18   authorization to work.

19          This case is not only analogous to *Gonzalez-Alvarez*

20   but also to *Ihenacho*, 716, F.3d 266, 277; *Bhutani*, 2006 F.3d

21   661, 668-70; *Marcus*, 82 F.3d 606, 610; and *Cadden*, 965 F.3d 1,

22   32.  I will say that if I'm incorrect and there was no

23   pecuniary harm, I would depart upward under Application Note 21

24   because the offense level would substantially understate the

25   seriousness of the offense and depart upward to the same level

1   20 that I have found.

2       In calculating the amount of the loss, I've included

3   the amounts directly paid to the defendant by the companies and

4   deposited in her own account.  That's $284,429.  With regard to

5   the Zelle payments, I find it is not permissible or possible to

6   include any of them in the loss for guidelines purposes.  Some

7   are likely payments from the companies to unindicted drivers

8   and losses to the companies.  But some Zelles are likely

9   payments to rent or buy accounts, payments for bots, or

10  payments unrelated to the conspiracy.

11      Based on the evidence, information provided to me, I

12  cannot reasonably estimate the amount of Zelles that constitute

13  loss as required by section 2B1.1 Application Note 3C.  So

14  there's no amount for Zelles in the loss calculation.  However,

15  with respect to one co-defendant, Da Fonseca, I find the

16  requirements for relevant conduct have been proven.

17      The First Circuit said in *Ahmed*, 51 F.4th 12, 23-24,

18  "The sentencing court must ascertain what activity fell within

19  the scope of the specific conduct and objectives embraced by

20  the defendant's agreement and then determine to what extent

21  other's acts and omissions that were in furtherance of jointly

22  undertaken criminal activity likely would have been foreseeable

23  by a reasonable person in the defendant's shoes at the time of

24  her agreement."

25      With regard to defining the conspiratorial agreement,

the indictment alleges, and the plea agreement reflects, the

defendant's agreement that there was one conspiracy here with

many co-conspirators.  As I have noted on February 24, and have

subsequently found in sentencing other co-defendants, in this

case, while there was a single conspiracy alleged, there's not

a single conspiracy proven under *Kotteakos* and its progeny.

Rather, the evidence supports conspiracy with a hub and many

spokes but no rim connecting those spokes, the co-defendants.

Among other things, a single conspiracy requires an

interdependence among participants as the First Circuit wrote

in *Portela*, 167 F.3d, 695, "To be interdependent, activities of

one aspect of the scheme must be necessary or advantageous to

the success of another aspect of the scheme.  Each individual

must think the aspects of the venture are interdependent and

each defendant's state of mind and not his mere participation

in some branch of the venture is the key."  The First Circuit

said that in *Portela* and in other cases.

With regard to *Kotteakos*, the Supreme Court wrote,

"The proof therefore admittedly made out a case not of a single

conspiracy, but of several, notwithstanding only one was

charged in the indictment."  The Court of Appeals aptly drew

analogy to the comment, "Thieves who dispose of their loot to a

single receiver -- a single fence -- do not by that fact alone

become confederates; they may, but it takes more."  And as the

defendants -- some of the defendants have argued, the

guidelines discuss an analogous situation of a drug dealer who foresees that his supplier will sell to other dealers but is not in a single conspiracy with the supplier's other dealers.

In this case, Ms. Barbosa entered into many conspiracies with individual co-defendants but not all of the co-defendants were in a single conspiracy with her.  With regard to Da Fonseca, however, who conspired only with Barbosa and unindicted drivers, the requirements for relevant conduct discussed by the First Circuit in *Ahmed*, 51 F.4th 12, 23-24, are proven, and it is possible to calculate the amount that constitutes relevant conduct relating to Da Fonseca.

More specifically, Da Fonseca received $128,522 in deposits from the companies.  Da Fonseca was a prolific driver who primarily rented fraudulent accounts from Barbosa.  They partnered together to obtain referral bonuses, and Barbosa forwarded to Da Fonseca his share of those bonuses via Zelle. Da Fonseca -- since Barbosa supplied Da Fonseca with fraudulent accounts, his driving was reasonably foreseeable to her and jointly undertaken activity.  His deposits were primarily from his driving, not from other activities Barbosa was not a part of.

The Court attributes Da Fonseca's $128,522 in deposits to Barbosa.  Some of the payments from the companies to co-defendants such as Cabral, Ramos, Da Silveira, Placido, Abreu, Ponciano, De Oliveira, and Wanderly might be, may be,

1 relevant conduct, but; however, as the Government states on the

2 evidence submitted to the Court, the Court cannot reasonably

3 estimate the amount of each. Therefore, the only relevant

4 conduct included in my loss calculation is the $128,552

5 attributable to Da Fonseca. That's added to the $284,000 --

6 well, $284,429 in direct deposits from the companies to

7 Barbosa's accounts. That totals $412,951. It adds two points

8 to the guideline calculation under Section 2B1.1(b)(1)(G), but

9 this relevant conduct doesn't affect the guideline range, which

10 is $250,000 to $550,000.

11         So that's my present view on loss. Do the parties

12 want to be heard? Does anybody have an objection to that?

13         MR. HOLCOMB: No. Thank you, Your Honor.

14         MR. SULLIVAN: No, Your Honor.

15         THE COURT: Then, in my view, there's also an

16 applicable two-point enhancement for the intentional use of

17 sophisticated means under Section 2B1.1(b)(10)(C). For this

18 two-point enhancement, the first issue is whether Barbosa

19 intentionally engaged in or caused others to use sophisticated

20 means.

21         The undisputed facts in the Presentence Report show

22 that Barbosa created over 2,000 fraudulent accounts. She

23 obtained driver's licenses images and social security numbers

24 from co-defendants who worked -- who used the darknet. She

25 used Bitcoin to purchase social security numbers on the

1    darknet.  She edited driver's license images and had others

2    edit them for her.  She bought plastic ID cards, printed edited

3    driver's license images on the cards using an ID printer, and

4    then took pictures of the printed licenses.  She connected the

5    group of co-conspirators that purchased the bot that jumped the

6    line for Instacart orders, contributed funds to the purchase of

7    the bot and sold the bot to drivers.  Taken in totality, this

8    conduct is sufficiently elaborate to require the enhancement.

9    Do the parties want to be heard on that?

10              MR. HOLCOMB:  No, thank you.

11              MR. SULLIVAN:  No, Your Honor.

12              THE COURT:  I don't find that the second way that

13   enhancement could be applicable is applicable.  This is the

14   issue of whether it was reasonably foreseeable to Barbosa that

15   a substantial amount of the conduct of the conspiracy in which

16   she was a member occurred outside the United States.  She did

17   work with unindicted Brazilian co-conspirator Ricardo Martins

18   according to paragraphs 39 and 42 of the Presentence Report,

19   however, there's insufficient evidence to establish when

20   Martins was in Peru and if he took substantial activity while

21   he was there.  So the enhancement, in my view, does not apply.

22   Do the parties want to be heard on that?

23              MR. HOLCOMB:  No, thank you.

24              MR. SULLIVAN:  No, Your Honor.

25              THE COURT:  And finally, I find there's no enhancement

1   for an authorization feature.  I addressed this, too, in detail

2   on February 24, as I previously ruled.  If all that supports

3   the Government's claim, disenhancement applies is the

4   defendant's use, transfer, or possession of a means of

5   identification, that is a driver's license.  Then section 2B1.6

6   Application Note 2 bars applying the enhancement.  I explained

7   my reasoning on this on February 24.  Such conduct is

8   sufficiently accounted for under 18, U.S.C. Section 1028A,

9   mandatory consecutive two-year sentence for aggravated identity

10  theft.

11          However, as this court has found previously, a

12  photograph of a driver's license that may have authentication

13  features is not the same thing as an authentication feature

14  itself.  This is essentially the ruling of *Jones*, 551 F.3d 19,

15  25-26.  Here, while the defendant photographed, reproduced

16  driver's licenses that had identification features, she didn't

17  do anything at all comparable to pricking the bubbles out in

18  *Jones*.  So there's no two-point enhancement for authentication

19  feature.  Do the parties want to be heard on that?

20          MR. HOLCOMB:  No, Your Honor.

21          MR. SULLIVAN:  No, Your Honor.

22          THE COURT:  And finally, I've considered -- although

23  neither the Government nor Probation in the PSR requests a role

24  enhancement for the defendant being a leader or manager or

25  supervisor of criminal activity, the Government accurately

1    characterizes her relationship with her many co-conspirators as

2    transactional, in a loose partnership.  She did not exercise

3    the authority or control that's needed to justify this

4    enhancement.  Do the parties want to be heard on that?

5          MR. HOLCOMB:  No, Your Honor.

6          MR. SULLIVAN:  No, Your Honor.

7          THE COURT:  All right.  So therefore, based on my

8    rulings, which are now final, the Total Offense Level is 20,

9    the Criminal History Category is I, the guidelines are 57 to 65

10   months, as I said.  33 to 41 months on Count 1 and I believe

11   it's Count 4, the aggravated identity theft count, is 24 months

12   consecutive.  The guidelines provide for 12 to 36 months

13   supervised release, a fine of $20,000 or $200,000.  I haven't

14   been given the information necessary to calculate restitution,

15   so I won't be ordering it.  There is, however, a mandatory $200

16   special assessment.

17         Do the parties agree that, based on my rulings, those

18   are the guideline ranges?

19         MR. HOLCOMB:  Yes, Your Honor.

20         MR. SULLIVAN:  Yes.  Yes, Your Honor.

21         THE COURT:  All right.  So to get to the essential

22   human aspect, what is the Government's recommendation and what

23   are the reasons for it, please?

24         MR. HOLCOMB:  Your Honor, the Government is

25   recommending a sentence of 36 months.  Of all the defendants in

1    this case, Ms. Barbosa was the most prolific creator of

2    fraudulent accounts and a central figure in this fraud network.

3    Put most simply, Ms. Barbosa was highly effective at this kind

4    of fraud and made a huge impact with the fraudulent accounts

5    that she created.

6         I'll first address the nature of her conduct before

7    moving onto the other 3553(a) factors.  Ms. Barbosa created

8    over 2,000 fake accounts.  She accumulated thousands of

9    photographs of identity theft victims' driver's licenses to use

10   in creating those accounts.  And the evidence gathered in the

11   course of the investigation demonstrates that Ms. Barbosa

12   essentially did this as a full-time job from the comfort of her

13   home.

14        She took part in almost every facet of the scheme.

15   She created fraudulent accounts with several of the

16   companies -- Uber, Lyft, DoorDash, Instacart -- and she

17   developed a network of people who could sell her the driver's

18   licenses and social security numbers that she needed to create

19   those accounts.  Those individuals gathered identifiers of

20   identity theft victims variously from the dark web, from taking

21   photographs of victims' driver's licenses when they delivered

22   alcohol to their homes, and in other ways.  She even purchased

23   an ID printer to use at her house.

24        Ms. Barbosa partnered with several co-defendants to

25   create and manage these fraudulent accounts, and these included

1    Edvaldo Cabral, Guilherme da Silveira -- who've already been

2    sentenced by Your Honor -- and co-conspirator Ricardo Martins.

3    Ms. Barbosa fraudulently generated referral bonuses with

4    DoorDash by creating fake accounts that were referred to the

5    app by a parent account that she controlled.  Sometimes these

6    referral bonuses that were generated exceeded $1,000.

7          THE COURT:  Pull the microphone closer so everybody,

8    including those behind you, can hear you.

9          MR. HOLCOMB:  Yes, Your Honor.  And Ms. Barbosa and

10   other co-conspirators managed these accounts to make sure that

11   the drivers who were using the referred accounts hit the number

12   of trips that were required to earn her and her co-conspirators

13   these large referral bonuses from DoorDash.

14         Ms. Barbosa also created a WhatsApp group chat

15   containing several co-conspirators, including several

16   co-defendants, who at first gathered to jointly purchase a bot

17   to use in connection --

18         MR. SULLIVAN:  Is that the group she named the Mafia?

19         MR. HOLCOMB:  Yes, Your Honor.  That's the Mafia group

20   chat.  And this group purchased this bot that was used with the

21   delivery company app to obtain the most profitable deliveries

22   on the app, and this group sold that bot to others, usually

23   customers, who were also renting accounts from them.  But as

24   time went on, this group discussed their creation of fraudulent

25   accounts over the various apps, and they discussed ways of

keeping these accounts open with the companies and avoiding
these companies' fraud detection systems.

With respect to Ms. Barbosa's personal history and
characteristics, Ms. Barbosa brought unique social talents to
bear on this charged fraud scheme.  And while the Government
concluded that a leadership enhancement didn't cleanly apply to
Ms. Barbosa, there's no question that she brought people into
this scheme, and she brought different people within the scheme
together to aid each other in committing this scheme.  Her
co-conspirators included ex-boyfriends, social contacts,
competitors.  They included Clovis Placido, a man who lived in
California and whom she had never even met in person.  They
included Bruno Abreu, who lived in her own apartment, and sold
her the driver's licenses' images that he collected while
making alcohol deliveries with Instacart.

Similarly, Ms. Barbosa showed herself to be
hardworking, productive, and very organized.  Put simply, she
had many hard-working virtues, but she directed them all to
fraudulent pursuits.  Her unique personal traits suggest that
she could have found success in lawful pursuits, but that's not
what she chose to do.  Ms. Barbosa also has a track record of
deception in this country.  The investigation revealed that she
not only engaged in this scheme, but she also obtained a Green
Card through a sham marriage to a US citizen whom she paid to
marry her and get her through the immigration interviews and on

1    to lawful permanent residence status in this country.  So

2    Ms. Barbosa not only had no qualms about stealing identities

3    and helping other people drive under stolen identities and

4    defrauding rideshare companies and customers, she also did not

5    hesitate to pay somebody to help her cheat the country's

6    immigration system.

7           With respect to her background, the PSR suggests that

8    she came from a stable family in Brazil, and she came here for

9    economic opportunity.  Again, she may have put her many talents

10   to lawful purposes, but she did not.

11          With respect to the need to afford adequate deterrence

12   and to protect the public, through all of her account creation,

13   Ms. Barbosa enabled many others to flout public security

14   regulations -- public safety regulations that have been put in

15   place to protect customers who get into the backs of cars with

16   strangers and who have strangers deliver items to their homes.

17   This is a highly regulated industry, as the Court has noted,

18   and Ms. Barbosa's activity blew a giant hole in the public

19   safety regime that makes these services available in the first

20   place.

21          The other danger here is that to identity theft

22   victims.  Other ordinary people, whether or not they used the

23   rideshare services or delivery services, whose identities were

24   stolen and used by people driving in their names.  General

25   deterrence is therefore critical, because Ms. Barbosa did not

1    do this alone.  She had suppliers; she had partners; and she

2    had hundreds, if not thousands, of clients.  And, Your Honor,

3    specific deterrence also is important here, because Ms. Barbosa

4    developed an expertise with this activity and largely did this

5    work, again, from the comfort of her home over the internet.

6    And that's something that she could continue to do when she is

7    out of prison and if she is deported to Brazil.

8          Finally, with respect to avoiding unwarranted

9    disparities, I have noted that Ms. Barbosa is the most culpable

10   charged defendant.  She is around the same level, if not more

11   culpable, than Mr. Aguiar, Mr. Cabral, and Mr. Da Silveira,

12   whom the Court has already sentenced to sentences between 40

13   and 45 months.  Any disparity in the sentence with respect to

14   Ms. Barbosa is warranted by other circumstances here, but the

15   Government respectfully submits that 36 months is appropriate

16   and no greater than necessary.

17         THE COURT:  Thank you.  Mr. Sullivan?

18         MR. SULLIVAN:  Thank you, Your Honor.  Your Honor,

19   Ms. Barbosa's 37 years old and she came from Brazil.  And she

20   came here as an intelligent woman and put her intelligence to

21   use in an extraordinary way that, while I think at the time,

22   she felt she was doing something good for immigrants that could

23   not get a job in the United States otherwise, she focused her

24   talents on something that did do significant damage to the

25   industry and to individuals also.

1    However, I think that, at the time that she was doing

2    this, she was focusing on the benefit that it did for people

3    who could not otherwise get employment in the United States at

4    the time.  That's a -- possibly a political issue that is for

5    another time and another place, but I think that that's where

6    it was.  She has no record --

7    THE COURT:  Well, this is, in some respects -- this

8    issue has come up in other sentencings of co-defendants:  That

9    people came here from Brazil and learned how to make a living

10   illegally, but they wanted a better life and they wanted to

11   send money back, perhaps, to Brazil, and they were helping out

12   friends.  If Ms. Barbosa had only made four or five or six

13   fraudulent accounts, she might not have been indicted, even if

14   she got caught.  She did 2,000.  She didn't have 2,000 friends,

15   I don't think.  And while she might have been -- you might say

16   she's helping the population generally; she made at least

17   $285,000 doing this.

18   I think the evidence indicates to me that her

19   motivation -- even though everybody says, and I accept it as

20   true, that she liked to help people.  She liked -- in this

21   case, using her intelligence the way she used it, working as

22   hard as she worked, takes a long time, I'm sure, to make 2,000

23   fraudulent accounts and get the bots and get the referral

24   bonuses.  It's not just generosity towards your countrymen, in

25   my view.

1          MR. SULLIVAN:  And I don't disagree, Your Honor.  But

2     I think this is a woman who I don't want to say has super

3     intelligence, but she is a very intelligent woman, and she did

4     put that intelligence to work in an area that is questionable

5     and was illegal.  And she -- to this day, she's tried to

6     rehabilitate herself through programs at the jail.  This is not

7     someone who's sitting in jail and stewing over her arrest and

8     conviction on this.  She has received legal assistance --

9     paralegal certificate from the facility that she's at; law

10    clerk training; Hustle Leadership; and self-esteem program.

11         But most notably, over the course of the past several

12    months, she's been the head chef at ACI Gloria McDonald where

13    she works from 6:00 a.m. until 5:00 p.m. each day, seven days a

14    week, and she serves food to approximately 135 people there.

15    And I think that shows you the drive that she has, and possibly

16    it explains part of the issue with regard to the drive that she

17    had when she was committing the crimes that she is now

18    convicted of.  But she's putting that to good use while she's

19    there and she hasn't sat there and just not done anything.

20         She is -- as I stated before, she has no record, no

21    record of violence, and she accepted responsibility promptly

22    with regard to this.  And for all of those reasons, I'd ask the

23    Court to look at it -- consider downward departure to 30

24    months, Your Honor.

25         THE COURT:  30 months?

1      MR. SULLIVAN:  30 months.  I know that the Government

2  is asking for 36 months, however.  I think that here's a person

3  who has learned from her mistakes, and that she will advance as

4  she has tried to rehabilitate herself without being ordered to

5  do so, and as well as being incarcerated for the past -- I

6  believe it's 26 months, among other things that she has done.

7  And I'd ask the Court to depart from the guidelines to a

8  sentence of 30 months, and that if there is any further time

9  that she needs to spend, we'd ask the Court to recommend the

10 First Step Program, which I think she would benefit from and so

11 would society if that's the case.

12      THE COURT:  Thank you.  Ms. Barbosa, you now have an

13 opportunity, but not an obligation, to speak before I decide

14 what sentence to impose.  That means you do not have to say

15 anything if you don't want to, but if there's something you'd

16 like to say for me to consider, now is the time.

17      THE DEFENDANT:  Thank you, Your Honor, for granting me

18 the opportunity --

19      THE COURT:  Pull that microphone near you.  Try to

20 speak as loudly and clearly as possible.

21      THE DEFENDANT:  I'm a little nervous.  Sorry.  Thank

22 you, Your Honor, for granting me the opportunity to speak, and

23 I apologize in advance if there is some errors in my words, as

24 English is not my primary language.

25          When I came to the United States in the search for a

1    better life, I had so many dreams.  One of my purpose was to

2    work hard, provide for my family, and make them proud.  I

3    clearly failed in this matter, engaging in unlawful activity,

4    and I'm completely ashamed of myself for the wrong path I took

5    in my life.

6           Despite the fact I never had malicious or intentions

7    of causing any trouble or harm to anyone.  I wasn't thinking

8    the consequence of my actions, if it was legal or not, if I was

9    hurting others or not.  The truth is that I did hurt and may

10   have caused problems for so many innocent people, and from the

11   bottom of my heart, I am so sorry.  I wish I could do something

12   good to help every single one I may have harmed.  I deeply

13   regret my actions and my involvement in this offense.

14          In these almost 26 months under custody, I have been

15   to different facilities.  During my time at Wyatt and

16   Framingham, I was subjected to every type of harassment, poor

17   medical care, discrimination, and many other issues.  At the

18   ACI, I can say that the place saved my life, and they believe

19   in all my potential.  Today, I'm the head chef in the kitchen

20   and I'm the one responsible for all the meals and diets and

21   make sure the entire population will be able to receive a nice

22   and proper meal, and I'm wondering how they are surviving today

23   without me there.

24          Aside my job in the kitchen, with the help of some

25   officers and the deputy's approval, me and another few inmates

started a garden project at the facility with an abundance of
fresh produce blooming and organic products that we are going
to use in the kitchen.  I also decide to use my time to learn
more.  I'm enrolled in an economic program in the Community
College of Rhode Island provides in the facility as a law clerk
in English and many others.  Outside the facility, I am
enrolled in the Blackstone Career Institute, where I graduated
with honors as a paralegal and I'm looking forward to work in
this field.

For a long time, I thought that my life was over, and
I lost many, many things due to my incarceration, especially
one of the most important persons in my life.  But today I'm
extremely grateful to be alive and I learned so much in these
past two years.  It's a very, very hard experience, but then I
started to understand that everything I passed through was for
my own good and inner growth.  I'm trying to be a better person
every day.  Unfortunately, I can't change the past and fix my
errors, however I can be a better person today and forever,
living a law-abiding life.  Thank you, Your Honor.

THE COURT:  Ms. Barbosa, please stand.  In connection
with the two counts to which you've pled guilty, I hereby
sentence you to serve 36 months in the custody of the Attorney
General of the United States, to be followed by 36 months of
supervised release on the standard and mandatory conditions on
page 32 of your Presentence Report, and on the special

1   conditions that you shall not engage in any occupation,

2   business, or profession that involves rideshare or delivery

3   service companies.  You must participate in a mental health

4   treatment program as directed by Probation.  You shall

5   contribute to the costs of any such program if you have the

6   means to pay or insurance.

7           If you're ordered deported, you must leave the United

8   States and not return without the prior permission of the

9   Secretary of Homeland Security, and you must, at all times, use

10  your true name and shall not use any false identifying

11  information which includes, but is not limited to, any alias,

12  false date of birth, false social security number, or incorrect

13  place of birth.

14          In addition, I'm imposing a fine of $20,000.  The

15  Presentence Report in Paragraph 101 indicates that you had a

16  net worth of about $65,000 when you were arrested.  I'm not

17  imposing any restitution, because I haven't been given the

18  information necessary to calculate the restitution.  But there

19  is a mandatory $200 special assessment.  In your plea

20  agreement, you waived your right to appeal the fact that you're

21  guilty in any sentence I impose, unless you claim your attorney

22  was ineffective -- and he's not been ineffective.  He's not

23  behaved or performed in a professionally unreasonable way -- or

24  unless you allege serious misconduct by the Government in

25  obtaining your guilty plea or sentence.

1    If you wish to appeal, a notice of appeal will have to

2  be filed within 14 days of the entry of judgment, and if you

3  can't afford a lawyer to pursue an appeal, one will be

4  appointed to represent you at Government expense.  I'm allowing

5  the Government's motion for forfeiture.  And I expect, fully

6  expect, the Bureau of Prisons will give you credit for the time

7  you've served in detention before this sentencing.

8    Essentially, I've given you the sentence that I find

9  is sufficient and no more than necessary to serve the purposes

10  of sentencing.  I've considered the nature and circumstances of

11  your crime.  You committed a very serious crime, and you did it

12  repeatedly.  You used your intelligence -- because the letters

13  I received said you're an intelligent, hard-working person, and

14  you used your intelligence to victimize ride share companies,

15  delivery companies, and people whose identities were stolen.

16  And you used your energy to find social security numbers on the

17  darknet, and you figured out a way to use bots to get more

18  lucrative assignments for the drivers, and to get referral

19  bonuses where they were being given higher amounts than other

20  parts of the country.  But there are real victims.  And I've

21  only heard from one of them.  But you committed a serious

22  crime.

23    I've considered your history and characteristics, and

24  it includes a number of positive qualities.  Everybody says you

25  like to help people.  I believe that.  And everybody said

1    you're a hard worker.  I've seen that.  Several people said

2    that your family instilled in you morals.  I haven't seen that.

3    I'm sure it's not your parents' fault; it's your fault.  And

4    I've taken into account that, since you've been detained, you

5    have lived constructively.  It's good that you've been

6    studying.  It's good you took that creative writing course and

7    wrote a paper on how other people in your facility would

8    benefit if they had better resources, better research.  That's

9    part of the reasons you didn't get a higher sentence.  But

10   nevertheless, and you knew it was illegal, you used some of

11   your positive qualities -- your industry, your intelligence,

12   your ability -- to create massive fraud.  You had 6,000

13   photographs of driver's licenses, 2,000 fraudulent accounts you

14   created.  That's a lot.

15        And you started breaking the law as soon as you got

16   here by lining up that sham marriage.  You said you came; you

17   had the American dream.  The United States is very generous in

18   admitting refugees and immigrants.  We can't admit everyone.

19   We seem to be especially generous in giving visitors visas to

20   people from Brazil, and you really abused the opportunity to be

21   here as a visitor and then even to have worked without

22   committing other crimes once you were here.

23        I have to give a sentence that reflects the

24   seriousness of the offense, promotes respect for the law, and

25   provides just punishment.  And because you committed such a

1    serious offense, so repeatedly, 36 months is necessary.  I have
2    to give a sentence that affords adequate deterrence.  That has
3    two dimensions.  I have to give a sentence that sends a message
4    to you:  Don't do anything like this again.  I mean, the
5    Government said -- and I've said it in other sentencings in
6    this case -- you could go back to Brazil and start doing again
7    everything you did here.  You're saying no.  I had a question
8    about whether you were likely to do that when you went back to
9    Brazil before seeing you today.  I'm satisfied that you're not
10   likely to do that yourself.
11         However, however, I have to send a message to other
12   people who are like you were.  They come here, they want to
13   make money, they want to live a better life, maybe they want to
14   send some of it back to their family in Brazil.  And they get
15   on these chats, and they say, Oh, I can buy fraudulent
16   accounts.  And then they say, Oh, I can make fraudulent
17   accounts.  And then they say, Oh, I can make hundreds of
18   thousands of dollars making fraudulent accounts.  I hope those
19   chat rooms -- there's no way I can know.  I hope those chat
20   rooms are now filled with chats about, Did you hear what
21   happened to Priscila Barbosa and the ten other people Judge
22   Wolf sentenced to three years in prison, four years in prison,
23   so they'll resist the temptation to emulate your example.
24   Because yours is a sad case, and I've said that some of the
25   other of your co-defendants I've sentenced, people you know in

1    some instances, are sad cases.

2         I have to give a sentence, also, that protects the

3    public; and, I think, as I said, you're not likely to do this

4    again, even from Brazil; where I expect you'll be deported.  So

5    that's not a primary purpose served by the sentencing.  But I

6    do have to give a sentence that avoids unwarranted disparity,

7    and I've given you a sentence that's lower than the sentence

8    I've given a number of your co-defendants who did much less

9    than you, and there are reasons that it's appropriate to do

10   that.  But it would not be appropriate to give you a sentence

11   of less than 36 months in view of the sentences imposed on

12   others and where your guideline range to start the sentence

13   could have been at least two years longer.

14        So now you'll have maybe about another year to serve.

15   And keep using your time productively.  The other people

16   detained will benefit from your cooking.  You can take more

17   courses.  When you get out, I expect you'll be subject to

18   deportation proceedings.  You've been ordered to leave the

19   United States promptly.  Get on the plane; go back to Brazil;

20   take the lessons you've learned; and continue to work hard and

21   use your intelligence and industry lawfully.  Your future

22   should be much happier than your past.  If you come back here

23   illegally, you'll get caught, you can be locked up for several

24   more years for this case, and then prosecuted for coming back.

25   So whatever temptation there might be to come back to the

1     United States, resist it, please.  You may be seated.

2              Is there anything further in this matter for today?

3              MR. HOLCOMB:  No, Your Honor, thank you.

4              MR. SULLIVAN:  No, Your Honor.

5              THE COURT:  Court is in recess.

6              (The court recessed at 3:30 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3              I, Jessica Leonard, Certified Shorthand Reporter

4    for the United States District Court for the District of

5    Massachusetts, do hereby certify that the foregoing transcript

6    is a true and correct transcript of the stenographically

7    reported proceedings held in the above-entitled matter, to the

8    best of my skill and ability.

9              Dated this 11th day of July, 2023.

10

11

12              /s/ Jessica M. Leonard_____

13              Jessica M. Leonard, CSR

14              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25